1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9     FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

11   CHARLES A. DIAZ,                    )      No. C 08-4744 SI (PR)
                                         )
              Petitioner,                )      **ORDER DENYING**
12     vs.                               )      **PETITION FOR WRIT OF**
                                         )      **HABEAS CORPUS**
13   TOM FELKER, Warden,                 )
                                         )
14            Respondent.                )
     _____ )      (Docket No. 13)
15

16                          **INTRODUCTION**

17        This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C.

18   § 2254.  For the reasons stated herein, the petition is DENIED.

19

20                          **BACKGROUND**

21        In 2004, a Mendocino County Superior Court jury convicted Petitioner of first degree

22   murder, and conspiracy to obstruct justice.  The trial court sentenced Petitioner to twenty-five

23   years to life for the murder conviction, three years for the conspiracy conviction, and a one

24   year enhancement for use of a knife in the commission of the murder.  The California Court

25   of Appeal for the First Appellate District struck the conspiracy conviction, and affirmed the

26   murder conviction.  (Ans., Ex. 1 at 1.)  The California Supreme Court denied his petition for

27   review.  (Id., Ex. 3.)  It appears that Petitioner did not seek state habeas relief.

28

                                         1

Evidence presented at trial shows that in 1986 Petitioner participated in the stabbing and shooting death of five-year-old Dallas Grondalski. Dallas's burnt corpse was found along with those of her father, Billy Grondalski, her mother, Patti, and her stepbrother, Jeremy Vandagriff, in the burnt ruins of their house in Fort Bragg, California. Billy had been a member of the Hell's Angels motorcycle club, Vallejo chapter, from 1984 to 1986. Petitioner was the sergeant-at-arms of the Vallejo chapter at that time, while Gerald "Butch" Lester was president. Some time after Billy left the club and had moved to Fort Bragg, Petitioner and Butch visited Billy to discuss his monetary debt to the club, his tattoo, and motorcycle.[1] A fight ensued, and Petitioner and Butch killed Billy and his family. Petitioner cut Dallas's throat, and, when it appeared that she was not dying quickly enough, Butch shot her. Fearful that they had left evidence of their participation in the crime, Petitioner and Butch returned to the crime scene and set fire to Billy's house. (Ans., Ex. 1 at 4–5.)

Evidence of Petitioner's guilt came largely from the testimony of other Hell's Angels, who came forward to law enforcement years after the murders:

Police investigation into the Grondalski murders stalled by 1989. [FBI agent] McKinley testified that the murders, and especially the killing of Dallas, "hit a lot of Hell's Angels wrong"; the homicides were "over the top" and "hit their gag reflex a little bit too hard." However, he said that loyalty to the club was "probably the single most important thing within the Hell's Angels value system." Both prosecution and defense witnesses said that it was dangerous to testify against the Hell's Angels. John Gerhart, a 73-year-old "retired" Hell's Angel, testified that he did not know why Billy was killed or which Hell's Angels were involved in the murders, and would not say even if he did.

There was a break in the case in February 1994 when Charlie Haas, a former Sonoma Hell's Angel awaiting sentencing on federal drug and weapons charges, offered to provide information about the killings. Haas was granted immunity in connection with the Grondalski case other than for the murders, and he hoped to have his 30-year federal sentence reduced in exchange for his testimony. He testified against Butch, who, after two mistrials, was convicted in 1997 of murdering Billy, Patti, Jeremy, and Dallas, and he testified against defendants herein.

---

[1] Upon his exit from the club, Billy received a tattoo that read "In 84, Out 86" to commemorate his time as a member. Former members who are in "bad standing" with the club, as Billy was, must have their tattoos removed or covered up. (Ans., Ex. 1 at 2.)

2

Haas, along with the Vallejo Hell's Angels and most of the Sonoma Hell's Angels, participated in a motorcycle run to Parker's Resort in Guerneville, a party attended by well over 100 people that was held from Friday, October 3 to Sunday, October 5, 1986.  Haas said that on Sunday morning at the run he went over to an RV where he heard that the Vallejo chapter was having a meeting.  Butch came out of the RV and told Haas that they had found Billy and were going up to see him about his club debt, tattoo, and motorcycle. Butch and [Petitioner] got into a pickup truck, with their motorcycles in the back, and left the run about 10:30 a.m.  FN3

FN3.  This testimony was inconsistent with that of other witnesses, who said that Butch and [Petitioner] drove away in a Blazer and left their motorcycles behind at the run.

Haas said that about 2:00 a.m. Monday he got a call from Butch who said that he had a problem and needed to see him.  When Haas met Butch about noon that day at the home of defendant Huffman, a Sonoma Hell's Angel, FN4 Butch told him that he and Billy had a fight, he had a gun to Billy's face, and the gun went off accidentally.  He then shot and killed Patti and Jeremy, while [Petitioner] cut Dallas's throat.  When it appeared that Dallas was not dying quickly enough, Butch shot her as well.  Butch was worried about having left DNA, fingerprints, or shell casings at the house, and Haas suggested burning the house down.  Butch got the keys to Huffman's van, he and Haas obtained six gallons of gasoline, they drove to Fort Bragg, poured gas throughout the house, and ignited the gas with a cigarette and matchbook.

FN4.  Haas noted that [Petitioner], who had a job at Mare Island, went to work that day.

Haas said that he went to see [Petitioner] the following Thursday, and asked him whether "'[Y]ou guys destroyed everything and got rid of everything and you didn't keep anything. [¶] And he said, 'No, don't worry about it. Everything's been melted down and burnt and taken care of.'  " About nine or 10 days later, Haas again asked [Petitioner] whether "'everything ha[d] been taken care of,'" and [Petitioner] assured him, "'It's all covered.'"

. . . .

Mike Tankersley, another key witness, surfaced in February 1996 when he was arrested in Arkansas on a fugitive warrant.  Tankersley had been expelled from the Sonoma Hell's Angels in 1987, and had fled the state to escape retribution from the club and avoid criminal prosecution.  When plainclothes officers drove up in an unmarked vehicle to arrest Tankersley at his Arkansas home, he was shot by the officers after he got in a pickup truck and rammed the vehicle trying to escape.  He was charged in Arkansas as a result of this incident with three counts of attempted capital murder that carried a maximum aggregate sentence of 90 years.  After he testified against Butch, those charges were reduced to three counts of aggravated assault, and he was sentenced pursuant to a plea bargain to serve six years in Arkansas, with three and a half years suspended, concurrent to any California sentence, and he escaped prosecution on two outstanding California warrants.

Tankersley testified that Butch and [Petitioner] approached him at the Parker's run and Butch asked if he would drive them to Billy's place. Tankersley did not want to leave the run, so he lent them his Blazer with the understanding that he could use their motorcycles while they were gone. When he next saw [Petitioner] at the run, [Petitioner] told him, "It went bad. It went wrong. They're all dead." He and [Petitioner] and Butch went into a cabin to talk about what had happened, and Butch said that he pulled his gun after Billy "made a move," and because "he wasn't used to a .45 . . . he killed Billy and then he had to shoot Patti and the boy and then that Chuck [Petitioner] killed little Dallas." Tankersley said he looked at [Petitioner] and asked him, "Why?" and [Petitioner] replied, "I had to. I had to, Mike."

Tankersley said that Butch "gave me the gun to get rid of it." He drove home with the gun, and met up with Butch and Sammie Lester. Butch said that he wanted Tankersley to burn down the Grondalskis' house. Tankersley did not want to drive because he had been drinking and taking a lot of drugs on the weekend of the run, so Butch said that Sammie would drive him. Tankersley and Sammie then went to his friend's motorcycle shop, where Tankersley melted the gun with a torch. He and Sammie then picked up some gasoline, and started driving toward Fort Bragg. However, when he and Sammie stopped for drinks in Ukiah, he decided he was not going to go to Fort Bragg, and they turned around and went home.

Tankersley acknowledged that, around the time of the murders, he was making a living selling drugs and collecting debts, and regularly carried a knife and a hammer. Tankersley had given Billy the tow truck Billy planned to use in his towing business. Tankersley admitted leaving California on Billy's motorcycle after the murders; he said that he had given Billy the motorcycle, and gotten it back from him before he died.

Dick Roach (Roach), defendant Hodgson's husband, testified that he went with Hodgson and his son, Patrick Roach, to the Parker's run in an RV.[2] Roach was a member of the Modified Motorcycle Association (MMA), a group that, according to Lieutenant Pintane, [Mendocino County Sheriff] had a close relationship with the Hell's Angels. Roach recalled seeing Tankersley at approximately 10:00 to 10:30 a.m. on Sunday "popping wheelies" on [Petitioner]'s motorcycle. Tankersley told Roach that "if [Petitioner] and Butch don't get back from Fort Bragg with my Blazer, it's my bike." At around 3:00 p.m. on Sunday afternoon, Butch came to the RV, asked for a fresh pot of coffee, asked Patrick Roach to leave, and then washed his hands and forearm with the coffee. About an hour later, Roach saw Butch talking to Sammie and noticed that Sammie was upset.

Roach was convicted in 1987 of manufacturing methamphetamine, and he first talked to law enforcement about the Grondalski case in 1994, when Pintane came to his house with Roach's parole officer. Roach said that he would not have talked to Pintane but for the presence of the parole officer. Roach had twice tested positive for drugs, and had been warned that a third positive test would result in his re-incarceration. When Roach tested positive a third time after being interviewed by Pintane, he was allowed to perform community service in lieu of going to prison.

---

[2] Petitioner's co-defendants were Hodgson, Lester, and Huffman.

4

Roach said that after he and Hodgson returned from the Parker's run, Hodgson received a call from Carl Dulinsky, another MMA member, and she went over to Dulinsky's shop, where she and Dulinsky burned something.

Dulinsky testified that he met Hodgson at his shop after returning from the Parker's run, and she told him that she had received evidence of a murder in Fort Bragg from [Petitioner] and Butch that needed to be destroyed. She handed him a bag containing a piece of flesh; she told him it was a tattoo that had been cut out of a victim, and added, "the whole family was murdered too, they were witnesses." Dulinsky got some wood and gas, and burned the piece of flesh in a 55-gallon drum.

Randy Spears testified that, at some point after Billy left the club, he and the other Vallejo Hell's Angels — [Petitioner], Butch and Newman — drove to Billy's home in Martinez, spoke with Patti, and told her to have Billy contact them. He said they wanted to speak to Billy about his tattoo and about Hell's Angels stickers he was selling. He said that when he left the Parker's run on Sunday morning he looked for [Petitioner] and Butch, but could not find them. He saw [Petitioner] later that day, around 5:00 to 7:00 p.m., at Newman's house.

In a November 1987 taped statement that was played at trial, Spears said that when he was leaving the run and asking if anyone had seen [Petitioner] and Butch, someone said, "[T]hey headed toward Fort Bragg." He testified that he spoke with [Petitioner] after hearing about the murders and asked him, "Hey, didn't you guys go up there on Sunday?" [Petitioner] replied that "[W]e started to go up on Sunday, and we had a flat tire . . . so we stopped and got something to eat while the tire was being repaired . . . and then we turned around and headed back home." When Spears recounted this conversation in his November 1987 statement, he said that he had the conversation with Butch, not [Petitioner]. He testified that he was not thinking straight at the time because he had just been arrested and told that he faced 45 years in prison. He said the interviewing officer, Detective Gourley, told him that they would go easy on him if he cooperated. Spears said that he tried to appear cooperative while protecting the club; after the interview, Gourley told him he would receive no benefit from the statement because he had not provided any new information.

Ricky Paulson, with whom Billy had lived for a time in 1986, testified that before Billy moved to Fort Bragg, Butch and Newman came by his house and asked him to tell Billy that he had to move out of Contra Costa County. After Paulson got back from a trip to Fort Bragg helping Billy move, Butch and John Gerhart came over and asked where Billy could be found and he told them where Billy was living.

Mark Linn, who had prospected for membership in the Vallejo Hell's Angels, went to the Parker's run and testified that he saw [Petitioner] and Butch get into a Blazer, with two other people he could not identify, and leave the run before 9:30 a.m. on Sunday. Linn testified that when he was talking with Hodgson a day or two after the run, she said, "Shit happens" when the murders were reported on TV.

Brian Webster, a "hang-around" (pre-prospect) for the Vallejo Hell's Angels in 1986, went to the Parker's run and stayed there until early Sunday afternoon. He testified that when he got up on Sunday between 8:00 and 9:00

5

a.m., he noticed [Petitioner] and Butch had left the run, and saw Tankersley riding [Petitioner]'s motorcycle.

Larry Sibiski, a Vallejo hang-around until the summer of 1986 and a member of the MMA, testified that he and MMA member Henry Light were at Light's home at some point in October or November 1986, when [Petitioner] and Butch came over, and Butch warned them not to talk about the Grondalski murders or associate his or [Petitioner]'s name with them. Butch pulled Sibiski aside and said he did not need an alibi from him because Sammie would provide one. The visit left Light shaking, and Sibiski afraid because he "didn't want to be next." Sibiski testified that [Petitioner] regularly carried a hammer, and that [Petitioner], like all the Hell's Angels, regularly carried a long knife.

Pintane testified that Hodgson admitted, in a statement after her arrest in November 1999, that she had burned the tattooed skin with Dulinsky. Dulinsky told her that he had gotten the skin from Sammie. Hodgson said there had been "ranting and raving" about Billy owing money, but "[t]hey didn't mean [for] it to happen that way . . . the whole purpose of the trip [was] to remove the tattoo." She recalled Butch disappearing from the run without his motorcycle, and Tankersley revving up a motorcycle and racing around on it. She remembered making coffee and being told "they're just going to wash their hands" with it. She said that, after she made the coffee, "I was told that I don't know anything." She said she "scrub[bed] patches" — symbols worn by Hell's Angels on their vests and jackets — that she received from Butch. She "knew one was Butch's. The other patch was a smaller, you know, vest size."

Pintane said that when he interviewed Tankersley's wife, Debrah Hanson, before Tankersley was arrested, she stated that Tankersley was angry when he returned home from the Parker's run and told her, "I can't believe it. Those guys used my Blazer to go up to Fort Bragg, and they killed the whole family."

Pintane said that when he was transporting Huffman from Sonoma County jail to Ukiah for a November 1999 court appearance, Huffman said, "Why did them guys have to pick my house to come to?"

(Ans., Ex. 1 at 3–9.) Butch was tried separately from Petitioner.

As grounds for federal habeas relief, Petitioner alleges that: (1) the pre-indictment delay violated his right to due process; (2) his right to due process was violated because the evidence insufficiently corroborated the accomplices' testimony; (3) the admission of hearsay evidence violated his Confrontation Clause rights; (4) the admission of evidence of unrelated crimes committed by other members of a motorcycle club violated due process; (5) restrictions on cross-examination of witness Charles Haas violated Petitioner's rights to confront witnesses, present a defense and due process; (6) Petitioner's right to due process was violated by spectator misconduct; (7) Petitioner's rights to confront witnesses and due process were violated by the trial court's requirement that a separately-tried co-defendant

6

assert his Fifth Amendment rights in front of the jury; (8) admission of evidence of that co-defendant's conviction of four murders violated Petitioner's rights to a jury trial, confrontation and due process; (9) prosecutorial misconduct; and (10) cumulative error.

**DISCUSSION**

A.   Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412–13 (2000). The petitioner bears the burden of showing that the state court's decision was unreasonable. Woodford v. Visciotti, 537 U.S. 19, 24 (2002). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1). Habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal quotation and citation omitted).

The state court decision implicated by 2254(d) is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005). Where there is no reasoned opinion from the highest state court to have considered the petitioner's claims, the district court looks to the last reasoned state court opinion, which, in this instance, is the opinion of the state appellate

1  court.  See Nunnemaker, 501 U.S. at 801–06; Shackleford v. Hubbard, 234 F.3d 1072, 1079

2  n.2 (9th Cir. 2000).

3

4  **B.    Petitioner's Claims**

5      **1.    Pre-Indictment Delay**

6          Petitioner's claims that the pre-indictment delay violated his due process right to a fair

7  and speedy trial.  (Pet. at 6-A.)  The homicides occurred in October 1986, but Petitioner's

8  prosecution did not start until November 1999.

9          The state appellate court rejected Petitioner's claim, and summarized the relevant facts

10  as follows:

11          The claims of prejudice below were:  (1) loss of [Petitioner]'s telephone
            records, routinely destroyed by the phone company after seven years, which
12          allegedly would have shown that [Petitioner] often called Butch and other
            Hell's Angels before the murders; this evidence would have been offered to
13          prove that there was nothing unusual about the record of calls between
            [Petitioner], Butch, and other club members immediately after the murders;
14          (2) loss of [Petitioner]'s employment records by virtue of the closing of the
            Mare Island Naval Shipyard; those records allegedly would have shown that,
15          for several weeks immediately preceding the murders, he was in San Diego
            working rather than in Vallejo looking for Billy as the prosecution maintained;
16          and (3) loss of allegedly exculpatory witness testimony through death,
            disappearance, or faded memories.  On appeal, [Petitioner] adds that some
17          prosecution witnesses admitted having memory problems and lacking any
            independent recollection of what transpired in 1986.

18
            [Petitioner] made a lesser showing of prejudice than the one labeled "weak"
19          in People v. Catlin. [Citation removed.]  The defendant in Catlin at least
            presented evidence in support of the motion.  [Citation removed.]  Here,
20          nothing was offered other than assertions in a memorandum of points and
            authorities.  The allegedly unavailable records would have had relatively little
21          probative value in any event.  Frequent phone calls between [Petitioner],
            Butch, and other Hell's Angels before the murders would have been merely
22          cumulative of other proof that club members were a close knit group.
            Working in San Diego before the murders would not have precluded
23          [Petitioner] from looking for Billy or killing Dallas on the weekend.  The
            significance of the allegedly unavailable testimony was never demonstrated
24          because the motion did not specify what any of the testimony would have
            been.  Witnesses cited on appeal whose recollections had faded by the time of
25          trial all testified for the prosecution, so their lapsed memories were at least as
            much a problem for the prosecution as for the defense.

26
            The prosecution argued, and the [trial] court evidently agreed, that the showing
27          of prejudice was insufficient to require any justification for the delay.  This

28

                                                    8

implied finding was supported by substantial evidence and must therefore be upheld.

We note further that there were reasonable justifications for the delay if any were required.  Initial investigations into the murders were unsuccessful, and the case against Butch and [Petitioner] did not begin to build until Haas came forward in 1994.  Tankersley, another crucial witness, was not located until after the first preliminary hearing in January 1996, and a second preliminary hearing, in July 1996, was thus required before [Petitioner] could be held to answer.  Investigative delay is justified, and "fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused.'"  [Citations removed.]

After [Petitioner] and Butch were arraigned in August 1996, [Petitioner] insisted on being tried separately from Butch, and agreed that Butch would be tried first.  Butch was convicted in a third trial, ending in November 1997. [Petitioner]'s trial was thereafter continued, at his request or without his opposition, until January 4, 1999.  [Petitioner] cannot complain of the delay from the August 1996 arraignment to the January 4, 1999 trial date because he either caused that delay or acquiesced in it.  [Citation removed.]

Former Mendocino County District Attorney Susan Massini dismissed the case on January 4, 1999, after having been defeated for re-election by Norman Vroman, who had served as Butch's defense counsel.  Included in the record is Massini's declaration explaining the reason for the dismissal.  Before the election, she had planned to personally prosecute [Petitioner], as she had Butch.  When she told [Petitioner]'s counsel in December 1998 that the Attorney General would need to take over the prosecution because of Vroman's representation of Butch, counsel said that [Petitioner] would not continue to waive time and would demand a trial date in January or February 1999.  She dismissed the case because the Attorney General could not have been ready for trial within the time [Petitioner] demanded.  It thus appears that there were reasonable grounds for the dismissal, and that the decision was not simply a dilatory tactic.  The delay the dismissal occasioned was also justified. The Attorney General convened the grand jury in October 1999, within a reasonable time after the dismissal given the complexity of the case, and secured the indictment on November 1, 1999.

(Ans., Ex. 1 at 18–20) (footnote removed).

A speedy trial is a fundamental right guaranteed the accused by the Sixth Amendment to the Constitution and imposed by the Due Process Clause of the Fourteenth Amendment on the states.  Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).  No per se rule has been devised to determine whether the right to a speedy trial has been violated.  Instead, courts must apply a flexible "functional analysis," Barker v. Wingo, 407 U.S. 514, 522 (1972), and consider and weigh the following factors in evaluating a Sixth Amendment speedy trial claim:  (1) length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.  Doggett v. U.S., 505 U.S. 647, 651 (1992);

9

Barker, 407 U.S. at 530; U.S. v. Lam, 251 F.3d 852, 855 (9th Cir.), amended, 262 F.3d 1033 (9th Cir. 2001). None of the four factors are either a necessary or sufficient condition for finding a speedy trial deprivation. Barker, 407 U.S. at 533. They are related factors and must be considered together with such other circumstances as may be relevant. Id. The Ninth Circuit considers the second factor, i.e., the reason for the delay, the "focal inquiry." U.S. v. King, 483 F.3d 969, 976 (9th Cir. 2007) (citing U.S. v. Sears, Roebuck & Co., 877 F.2d 734, 739–40 (9th Cir. 1989)).

Applying these principles to the instant matter, the Court concludes that Petitioner has not shown that he is entitled to habeas relief on this claim, even though some of the factors weigh in his favor. As to the first factor, a thirteen-year delay is sufficiently lengthy to be presumptively prejudicial. Depending on the nature of the charges, the lower courts have generally found post-accusation delay presumptively prejudicial at least as it approaches one year. See Doggett, 505 U.S. at 651 n.1. While this factor weighs in favor of Petitioner, the second factor, the "focal inquiry," does not. The crime scene yielded little in the way of evidence of the perpetrators, especially considering that the percipient witnesses to the crimes, the victims, were dead, and the crime scene destroyed. It was not until key witnesses came forward many years after the crime to offer crucial information. In sum, such a lengthy delay was reasonable considering that the key witnesses did not offer the police their crucial information until years after the crimes.

As to the third factor, Petitioner timely and clearly asserted his right to a speedy trial through his filing of a motion in the trial court. (Ans., Ex. 1 at 17 n.7.) While this factor weighs in favor of Petitioner, the fourth, and final, factor does not. Specifically, Petitioner has not shown that he was prejudiced by the delay. As the state appellate court found, the phone records would have been "cumulative of other proof that club members were a close knit group," the work records would not account for where Petitioner's whereabouts or activities on weekends, and Petitioner failed to identify his key witnesses whose recollections would have benefitted his defense, or the evidence they would have offered. Furthermore, the final delays in prosecution — the delay from 1996 to 1999, and the dismissal of the

10

1    charges in 1999 — arose in part from Petitioner's own actions.  On this record, Petitioner has
2    been unable to demonstrate that he suffered prejudice, or that his speedy trial right was
3    otherwise violated.  Accordingly, Petitioner's claim is DENIED.

4

5              **2.    Insufficient Corroborative Evidence**

6         Petitioner claims that his right to due process was violated because the evidence was
7    insufficient to corroborate the accomplices' testimony.  (Pet. at 6A.)  More specifically,
8    Petitioner contends that because the witnesses were also accomplices, they were motivated
9    to incriminate Petitioner "in order to minimize their own criminal liability." (Id.)  "Thus,"
10   Petitioner continues, "there was insufficient corroboration under California law and the
11   conviction violates [d]ue [p]rocess." (Id.)

12        The state appellate court rejected Petitioner's claim.  The witnesses (Haas, Tankersley,
13   Dulinsky and Newman) were accomplices to the conspiracy crimes, not the murders, and
14   therefore corroborative evidence as to their testimony regarding the murder was not
15   required.  Furthermore, the state appellate court reasoned, there was sufficient corroboration
16   of the accomplices' testimony.  Specifically, the non-accomplice witnesses testified to (1)
17   hearing that Petitioner and Butch were headed to Fort Bragg on the day of the murders, (2)
18   hearing Tankersley state that Petitioner's motorcycle would be his if Petitioner and Butch did
19   not return from Fort Bragg with Tankersley's vehicle, (3) seeing Tanskersley ride Petitioner's
20   motorcycle after the murders, and (4) the physical evidence, which showed that the victims
21   had been shot and that Dallas had been stabbed.

22        Petitioner is not entitled to habeas relief on this claim. First, as the state appellate court
23   found, corroborative evidence of the witnesses' testimony was not necessary, as the
24   witnesses were accomplices to the conspiracy, not the murders.  There was corroborative
25   evidence, as detailed by the state appellate court.  Specifically, the physical evidence, that
26   several persons testified that Petition travelled to Fort Bragg on the day of the murders, and
27   Tankersley's use of Petitioner's motorcycle after the murders provided corroborative support
28   for the accomplices' testimony.  Accordingly, Petitioner's claim is DENIED.

### 3. Admission of Hearsay Evidence

Petitioner claims that the trial court's admission of several pieces of hearsay evidence violated his rights under the Confrontation Clause.  (Id. at 6-A–6-B.)  Petitioner, with one exception, does not specify which pieces of hearsay evidence he means.  The Court will look at those instances identified by the state appellate court in its opinion.  Each instance will be addressed individually below.

The Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact.  See Coy v. Iowa, 487 U.S. 1012, 1016 (1988).  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination.  Id.  Out-of-court statements by witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness.  Id. at 59.  "Testimonial hearsay" can be roughly defined as "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Id. at 52.  Specific examples include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  Id. at 68.

A Crawford claim, like all other Confrontation Clause claims, is subject to harmless error analysis.  See U.S. v. McClain, 377 F.3d 219, 222 (2d Cir. 2004).  In the context of reviewing a state court conviction under 28 U.S.C. § 2254, this of course means that relief is in order only if the admission at issue "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

### A.   Mary Ann Hodgson

The state appellate court rejected this claim, and summarized the relevant facts as follows:

> The statements in question were Hodgson's admissions after her 1999 arrest that she "scrub[bed] patches" and made coffee for washing after Butch returned to the Parker's run. Hodgson told Pintane: "I did scrub patches. I cleaned patches. I can't be positive about who they belonged to." "I knew one was Butch's. The other patch was a smaller, you know, vest size." "I made coffee, and it didn't matter how strong it was because they're just going to wash their hands. That's what it was for." These statements were testimonial hearsay because they were made in response to police investigative questioning about the crimes long after they were committed. [Citation removed.]
> . . . .
>
> [Petitioner] argues with respect to the newly-challenged statements that "it must have been perfectly obvious to the jurors that [he was] the other person with the smaller vest who washed his hands with [Butch]." [Citations removed.] If the statements about coffee and patches were obviously incriminating to [Petitioner] as he now maintains, then he should have objected to them below [ ]. The argument has no merit in any event.
>
> Hodgson's statement that "they[ ]" were going to wash "their" hands with coffee did not refer directly to anyone, and since there was no evidence that anyone other than Butch washed his hands with coffee, her use of the plural pronoun appears to have been casual and imprecise. Even if the statement could have been taken to imply that someone other than Butch cleaned up with coffee after the murders, it was not apparent who that other person was. The statement about cleaning a vest smaller than the one worn by Butch likewise implicated no one in particular, and encompassed all Hell's Angels who were smaller than Butch. The statement could have referred to a host of people other than [Petitioner], including Tankersley, known as "Little Mike," who appears from a photo in evidence to have been smaller than Butch.
>
> Since the statements did not refer directly, or by immediate or obvious inference, to [Petitioner] [citation removed], their admission did not violate his right to confrontation [ ]. [Citations removed.]

(Ans., Ex. 1 at 25–27.)

Petitioner is not entitled to habeas relief on this claim. Specifically, the record supports the state appellate court's reasoning that because the statements did not implicate Petitioner, either directly or indirectly, his rights under the Confrontation Clause were not violated. The statements, then, were not evidence against him. Accordingly, Petitioner's claim is DENIED.

### B.   Huffman

Huffman, as stated above, a co-defendant, was a Sonoma Hell's Angel.  The state appellate court rejected Petitioner's claim as to Huffman's statement, and summarized the relevant facts as follows:

> [Petitioner] argues that Huffman's statement to [Sheriff] Pintane — "Why did them guys have to pick my house to come to?" — was also inadmissible under Crawford.  However, even if this apparently spontaneous remark while being transported to a court appearance qualified as testimonial hearsay, there was no evidence suggesting that [Petitioner] was among the "guys" to whom Huffman was referring.  To the contrary, the testimony was that [Petitioner] went to work at Mare Island on the Monday after the Parker's run when the meeting at Huffman's house took place.  Since the statement did not incriminate [Petitioner], it did not violate his right to confrontation.

(Ans., Ex. 1 at 27.)

The Court concludes that the state appellate's determination was not constitutionally erroneous.  Assuming, without deciding, that the statement was testimonial hearsay, it cannot rationally be said to incriminate Petitioner.  As such, the error, if there was error, cannot have "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 623.


### C.   Hanson

Hanson was Tankerseley's wife.  The state appellate court rejected Petitioner's claim as to Hanson's statements, and summarized the relevant facts as follows:

> The court overruled a hearsay objection to Pintane's testimony that Tankersley's wife, Hanson, told him in an interview that Tankersley said, when he returned home from the Parker's run, "Those guys used my Blazer to go up to Fort Bragg, and they killed the whole family."  [Petitioner] contends that it was Crawford error to admit this statement.  In view of Tankersley's testimony that Butch and [Petitioner] took his Blazer to Fort Bragg and upon returning admitted that they had committed the murders, the jury could have inferred that the "guys" in this statement were Butch and [Petitioner].  Since the statement was testimonial hearsay that directly incriminated [Petitioner] in the context of the evidence in the case, there was no showing that Hanson was unavailable to testify, and [Petitioner] had no prior opportunity to cross-examine her, the statement was inadmissible under Crawford.

> However, the error was harmless beyond a reasonable doubt. [Citations removed.]  As detailed above, Tankersley's testimony that [Petitioner] and Butch took his Blazer to Fort Bragg was corroborated by the testimony of Spears, Roach, and Mark Linn, and other aspects of his testimony were

14

corroborated by Roach, Webster, Hodgson, and Sibiski. In light of that evidence, additional corroboration from Tankersley's wife was cumulative and inconsequential. This conclusion is supported by the prosecution's thorough closing arguments, which among other things set forth "21 reasons" to find [Petitioner] guilty and emphasized the importance of corroborating evidence, but did not mention Hanson's statement.

(Ans., Ex. 1 at 27–28) (footnote removed).

The Court concludes that the state appellate's determination was not constitutionally erroneous. Assuming, without deciding, that the statement was testimonial hearsay, it cannot be said to be prejudicial Petitioner as such evidence was cumulative of other and admissible evidence that corroborated by the testimony of several other witnesses. As such, the error, if there was error, cannot have "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623.

### D. Butch

The state appellate court summarized the relevant facts as follows:

[Petitioner] objected . . . to admission of Butch's statements to prosecution witnesses. The prosecution argued, and the court agreed, that the statements were admissible under the coconspirator exception to the hearsay rule. (Evid.Code, § 1223.) [Petitioner] contends that the court erred, and that Butch's statements to Tankersley, Haas, and Hodgson should have been excluded.

Tankersley testified that Butch came up to him at the Parker's run with [Petitioner] and asked him to drive them to Billy's house. Haas testified that Butch told him at the run that they were going to see Billy to settle club business. Tankersley said that Butch described the murders when he returned to the run with [Petitioner] and gave him his gun to destroy. Haas said that Butch described the murders when he enlisted his help with evidence at the crime scene. Butch told Tankersley that [Petitioner] killed Dallas, and he told Haas that [Petitioner] was the one who stabbed her.

(Ans., Ex. 1 at 28–29). The state court concluded that Butch's statements were properly admitted under the state's co-conspirator exception to the hearsay rule. (Id. at 31.)

As an initial matter, this is not a Crawford claim. Crawford, as stated above, applies only to testimonial hearsay. It cannot reasonably be concluded that Butch's statements to his fellow Hell's Angels and their hangers-on fall under even the broad definition of statements

1  a reasonable person would think would be used in a legal proceeding.  This claim is simply
2  a hearsay claim.

3      The admission of evidence is not subject to federal habeas review unless a specific
4  constitutional guarantee is violated or the error is of such magnitude that the result is a denial
5  of the fundamentally fair trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d
6  1021, 1031 (9th Cir. 1999).  The due process inquiry in federal habeas review is whether the
7  admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally
8  unfair.  See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).  However, only if there
9  are no permissible inferences that the jury may draw from such evidence can its admission
10 violate due process.  See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  The
11 Supreme Court has found that the admission of hearsay evidence under a state's co-
12 conspirator hearsay exception does not violate a defendant's Confrontation Clause rights
13 where the witness was under oath and subject to cross-examination before the trier of fact.
14 Dutton v. Evans, 400 U.S. 74, 88 (1970).

15     Here, Petitioner is not entitled to habeas relief on this claim.  First, this Court must
16 defer to the the trial court's determination that the hearsay statement was properly admitted
17 under state law. Specifically, Petitioner has not been able to show that the state court's
18 interpretation and application of state law constituted "a fundamental defect which inherently
19 resulted in a complete miscarriage of justice," or "exceptional circumstances where the need
20 for the remedy afforded by the writ of habeas corpus is apparent."  Little v. Crawford, 449
21 F.3d 1075, 1083 (9th Cir. 2006).  In fact, the petition is bare of any stated basis why the trial
22 court's ruling was constitutionally erroneous, or erroneous under state law.

23     Second, the witness, Tankersley, testified at trial, and was therefore under oath and
24 subject to cross-examination, per the requirements of Evans, cited above.

25     Third, the admission did not violate due process because the jury could permissibly
26 infer from the statements that Butch and Petitioner committed the crimes in the way
27 corroborated by the physical evidence.  See Jammal, 926 F.2d at 920.  On this record,
28 Petitioner's claim is DENIED.

### 4.     Admission of Unrelated Crimes Evidence

Petitioner claims that the admission of evidence of unrelated crimes committed by other members of a motorcycle club violated due process. (Pet. at 6-B.) Petitioner contends that such evidence was more prejudicial than probative. (Id.)

At trial, Tim McKinley, a former FBI agent, testified as an expert on the Hell's Angels. The state appellate court summarized his testimony as follows:

> McKinley testified about various club matters including the importance of loyalty, the consequences of expulsion in bad standing, and the members' reactions to the Grondalski murders. He also addressed such topics as the origins of the club, the significance of club patches, the relationship between chapters and the club as a whole (families within a tribe), and the personal attributes the club valued in members (cunning, physical bravery, discretion).
>
> McKinley opined that the Hell's Angels are primarily an organized crime group, operating "through means of extortion and violence and intimidation to control territory for the commission of criminal offenses, ranging from the distribution of significant quantities of controlled substance to burglary, robbery, murder for hire, murder, and so on." McKinley said that every Hell's Angel he investigated had operated his "own pyramid-shaped crime structure of between 9 and 30 non[-]Hell[']s Angels who are involved in criminal activities in support of the Hell[']s Angels." He referred during the course of his testimony to instances where club members had threatened and bribed judges. He said that a woman named Margo Compton was killed for testifying against club members. She was murdered along with her six-year-old-twin daughters on the orders of Buck Garrett, Sammie's ex-husband, who had specified that the twins were to die first.

(Ans., Ex. 1 at 32.) The state appellate court rejected Petitioner's claim on grounds that an expert's testimony was needed to explain gang sociology and psychology, subjects beyond the common experience of most jurors. (Id. at 33.) Furthermore,

> [o]ther crimes evidence was not the principal focus of McKinley's testimony, and his opinion that the Hell's Angels are primarily engaged in organized crime was not unduly prejudicial in the context of this trial, where most of the members who testified, and several of the witnesses who associated with the club, were shown to be convicted felons or admitted engaging in criminal activity. We find no abuse of discretion in admitting the testimony had that objection been preserved.

(Id. at 33–34.)

Petitioner is not entitled to habeas relief on this claim. First, it is reasonable to assume that the nature and structure of the Hell's Angels would be beyond the common experience of jurors. Accordingly, it appears reasonable to admit McKinley's testimony so that the jury

could understand Petitioner's motives and loyalties as they arose from the Hell's Angel's structure and customs.  Second, Petitioner has not shown that it was a violation of due process to admit evidence of his associates' criminal history.  Petitioner himself has no clearly established right regarding propensity evidence.  The Supreme Court has not found that the admission of propensity evidence offends the Due Process Clause.  Indeed, the Supreme Court has expressly left open that very question.  Estelle v. McGuire, 502 U.S. 62, 75 n. 5 (1991).  Because it is an open question, it is not clearly established federal law that the admission of propensity evidence violates due process.  If Petitioner himself has no constitutional protection against the admission of propensity evidence against himself, he has not shown that admission of such evidence regarding others violates his due process rights.  Third, McKinley's testimony would not have been prejudicial because the jury heard other extensive evidence regarding the bad acts of many of the witnesses.  Accordingly, Petitioner's claim is DENIED.

### 5.    Limits on Cross-Examination

Petitioner claims that the trial court's restrictions on the cross-examination of Charles Haas violated Petitioner's rights to confront witnesses, present a defense and due process. (Pet. at 6-C.)  According to the petition, the trial court prohibited defense counsel from impeaching Haas with his murder of Shelly Hoke, a crime unrelated to the Fort Bragg killings at issue here.  Defense counsel, then, was unable to inform the jury that Haas was motivated to testify falsely against Petitioner.  (Id.)

The state appellate court described the relevant facts at length:

The prosecution initially moved in October 2001 to preclude impeachment of Haas on the subject of Hoke.  The motion indicated that Hoke, also known as "Mississippi," had associated with Hell's Angels members, including Haas. At some point Hoke disappeared; she remained missing, and was possibly dead.  During Haas's federal trial, a witness named Darrell Benson testified that Tommy Lewis told him "that he had a conversation about Mr. Haas, and that the problem with Mississippi had been cleaned up."  Haas denied any knowledge of Hoke's whereabouts or what, if anything, happened to her.

The Hoke matter was broached at a February 2002 hearing, where Lieutenant Pintane testified about Haas's refusal to allow questions involving Hoke to be included in a polygraph examination he took in 1994 concerning the

Grondalski murders. It had been agreed that federal authorities would seek a reduction in Haas's federal sentence if he assisted both with the Grondalski murders and a DEA investigation into Hell's Angels drug trafficking on the East Coast. Pintane recalled that the decision not to ask Haas about Hoke was made by "investigators from the East Coast," who "did not want to hold up our investigation [of the Grondalski murders], and they felt that they could probably talk to him more about Shelley Hoke at some other time." Pintane said that Haas was involved in drug dealing with Tommy Lewis in Virginia, that the DEA thought that Hoke had likely been murdered, and that Lewis and Darrell Benson, an informant the DEA considered credible, had accused Haas of Hoke's murder; Haas, however, maintained his innocence. In a November 2003 order, the court found that the motion to limit Haas's cross-examination as to Hoke was "premature."

The prosecution renewed the motion in February 2004, supported by points and authorities laying out the Hoke case. When Hoke disappeared in 1991, she was working for a large interstate methamphetamine manufacturing and distribution organization in which Lewis and Haas were partners. She was one of Lewis's girlfriends, and an "entertainer" responsible for servicing Hell's Angels members.

In June or July 1991, when law enforcement was investigating the drug operation in Virginia, Lewis had his associate Russell Zink drive Hoke to Phoenix because he feared that she would reveal information about the organization if pressured by the authorities. Zink left Phoenix and drove back to Virginia in June 1991 when law enforcement authorities appeared at the apartment complex where he and Hoke were staying. Hoke moved in with another man who lived in the complex. In early July 1991, that man gave her a lift to the airport for a flight to California or New Mexico. That man received one or two calls from her after she left, and never heard from her again.

Phoenix authorities investigating Hoke's disappearance received a phone call in December 1992 from a Richmond, Virginia police detective about an alleged homicide in that state. The detective advised that a confidential informant had reported that Russell Zink, a member of the Hell's Angels or another motorcycle club, had killed his girlfriend, Hoke, and dumped her body in Florida. A woman named "Shelley Corrine Hoke" had been stopped in Richmond, on May 4, 1992, for possible drunk driving. Zink was transferred from Virginia to Arizona on July 15, 1992, to serve a sentence for drug possession.

Haas's wife Kae told Pintane that Haas had brought Hoke to Kae's home and left her there for a time in September 1992. Kae thought that Hoke was running drugs for Haas and that she was Haas's girlfriend. In October 1992, Haas told Kae that he was going to the Reno airport to pick up Hoke, but returned home without her, saying that she had returned to Arizona. Later, when Haas and Kae were headed toward a remote area in Mendocino County, Haas told Kae, "This is where Shelley is at." Pintane went to the Mendocino property where Haas and Kae were headed, but found no information relating to Hoke's disappearance. Lewis told Pintane that Haas told him in late 1992 that he had killed Hoke. Lewis said that Haas killed Hoke because she talked too much and was "always . . . in 'Kae's face.'"

Benson told Pintane that he believed Haas had killed Hoke on orders from Lewis. Glenn Yank, another participant in the drug operation, told Pintane that no one would have killed Hoke "without the approval of Tommy Lewis or maybe Haas."

The court ruled at a pretrial hearing that defendants would be precluded from inquiring into the Hoke matter, and the court sustained objections to questions Hodgson's counsel attempted to ask McKinley about the matter at trial.

(Ans., Ex. 1 at 34–37.)

The state appellate court rejected Petitioner's claim, finding that the Hoke evidence was properly excluded on grounds that it had "marginal probative value":

The situation surrounding Hoke's disappearance as disclosed in the record is tangled and ambiguous. It is not clear when or how she disappeared, whether she was murdered, or who was responsible if a murder did occur. Sorting through the matter would have taken a good deal of time, and created a murder trial within a murder trial. The evidence could reasonably be regarded as unproductive and distracting on the issues in this case.

On the other hand, the evidence had relatively little probative value. The jury learned from other testimony that Haas was a violent felon capable of murder. It heard that he had: (1) murdered a disco manager in Germany by hitting him in the head with a pipe and stabbing him; (2) stabbed another person in the disco 17 times; (3) shot off the top of someone's ear; (4) beaten up a New Jersey police officer; (5) beaten up a Vallejo Hell's Angel known as Kanack; (6) twice broken Tankersley's jaw; (7) broken the nose of another drug dealer; (8) paddled and punched women who interfered with club business; and (9) been convicted of murder, drug offenses, weapons offenses, and attempted armed robbery.

[Petitioner] claims that the Hoke evidence was relevant because of what the briefs call the "implied" or "de facto" immunity he received for her murder in exchange for his testimony. However, there is no evidence that any such immunity was granted. The "well established principle that the defense is entitled to elicit evidence that a witness is motivated by an expectation of leniency or immunity" does not apply "[i]n the absence of proof of some agreement which might furnish a bias or motive to testify against [the] defendant." [Citation removed.] The jury was informed of the only agreement shown in the record that Haas received — the potential for reduction of his federal sentence – and he admitted that he hoped his testimony in the case would be his "ticket out" of prison.

(Id. at 37–38.)

In presenting a defense, a criminal defendant has "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . the right to present a defense, [and] the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." Washington v. Texas, 388 U.S. 14, 19 (1967).

1    That being said, what witnesses and evidence the parties may introduce at trial is

2    limited. "State and federal rulemakers have broad latitude under the Constitution to establish

3    rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324

4    (2006) (quotations and citations omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42

5    (1996) (holding that due process does not guarantee a defendant the right to present all

6    relevant evidence). The exclusion of evidence does not violate the Due Process Clause

7    unless "it offends some principle of justice so rooted in the traditions and conscience of our

8    people as to be ranked as fundamental." Egelhoff, 518 U.S. at 42. The defendant, not the

9    state, bears the burden to demonstrate this. Id. at 47 (internal quotations and citations

10   omitted).

11       In deciding if the exclusion of evidence violates the due process right to a fair trial or

12   the right to present a defense, the Court balances the following five factors: (1) the probative

13   value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is

14   capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or

15   merely cumulative; and (5) whether it constitutes a major part of the attempted defense. Chia

16   v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004); Drayden v. White, 232 F.3d 704, 711 (9th

17   Cir. 2000).

18       Petitioner is not entitled to habeas relief on this claim. Applying the relevant Chia

19   factors to this claim bears out this conclusion. While the first factor weighs in favor of

20   Petitioner — witness credibility is of great importance — the second factor, whether the

21   evidence was reliable, does not. As the state appellate court put it, "The situation

22   surrounding Hoke's disappearance as disclosed in the record is tangled and ambiguous. It

23   is not clear when or how she disappeared, whether she was murdered, or who was

24   responsible if a murder did occur." Not only is it unclear whether Hoke was in fact

25   murdered, the evidence of Haas's involvement in her alleged murder is at best ambiguous.

26   The third factor — whether the evidence was capable of evaluation by the jury — does not

27   weigh in Petitioner's favor. The evidence was too "tangled and ambiguous" for a jury to

28   properly evaluate it. Therefore, the trial court correctly excluded the Hoke evidence because

its probative value was outweighed by its prejudicial effect.  Furthermore, presentation of the Hoke evidence would have needlessly consumed a great deal of trial time.  If the Hoke evidence had been presented, the prosecutor would have been entitled not only to cross-examine the relevant witnesses, but to call rebuttal witnesses, or present other evidence undercutting the witnesses' credibility, thereby creating, as the state appellate court noted, "a murder trial within a murder trial."   Under the broad latitude this Court must accord California lawmakers, the Court concludes that the trial court's exclusion of the witnesses' testimony was a decision reasonably taken in order to avoid an undue consumption of trial time.

The fourth factor also weighs in favor of the prosecution.  As the state appellate court pointed out in detail, the Hoke evidence would have been cumulative of other impeachment evidence, including, significantly, Haas' convictions for murder, drug offenses, weapons offenses, and attempted armed robbery.  The fifth, and final, factor also weighs in favor of the prosecution, for the same reasons cited above:  undue consumption of time with the presentation of weak evidence.  Accordingly, Petitioner's claim is DENIED.

### 6.    Alleged Spectator Misconduct

Petitioner claims that the trial court violated his right to a fair trial when it denied a motion for mistrial based on spectator misconduct.  (Pet. at 6-C.)

According to the state appellate court,

> On March 4, 2004, the first day of trial, defense counsel advised the court outside the presence of the jury that, during the noon recess, five or six people were lined up on stairs outside the courtroom wearing T-shirts bearing a young girl's photograph and the words "Justice for Dallas."  Counsel moved for a mistrial on the ground that the jurors must have seen this display "orchestrated" to "intimidat[e]" them.  Hodgson's counsel urged that those involved in the demonstration be arrested under Penal Code section 169, which makes it a misdemeanor to picket or parade in or near a courthouse with the intent to interfere with the administration of justice or influence any juror.

(Ans., Ex. 1 at 38.)  The trial court denied the motion for a mistrial, declined to arrest the demonstrators, admonished the demonstrators to cease their activities, and spoke to the jury regarding the incident.  The trial court told the jury that the demonstrators' use of "justice"

was "exactly the opposite of what the rest of us should do in those same circumstances," reminded the jury that the presumption of innocence is central to the criminal legal process, and asked the jurors whether anyone was intimidated by the demonstrators or thought he or she could not "give both sides of this case a fair trial." (Id. at 38–39.)  The jury did not indicate that they could not fulfill the duties as defined by these instructions.  (Id. at 39.)

The state appellate court rejected Petitioner's claim, finding that the trial court's admonition to the jury cured any prejudice caused by the demonstrators:

> Here, the T-shirts bearing Dallas's photo were worn only once, outside the courtroom, at the very beginning of the lengthy trial.  The court immediately and forcefully admonished the jury to disregard the display, and the jury's response to the court's questions indicated that they would not would be influenced by it.  Given that prompt admonition and response, the court could reasonably find that defendants were not prejudiced by the T-shirts.

(Id. at 41.)

The Supreme Court has explicitly held that it is an open question whether private-actor courtroom conduct can be so prejudicial as to deny a defendant his right to a fair trial.  See Carey v. Musladin, 549 U.S. 70, 76 (2006).

Petitioner's claim is foreclosed by Musladin.  Because Petitioner does not have a clearly established due process right under these circumstances, the state appellate court's denial of his claim cannot have been contrary to or an unreasonable application of clearly established federal law.  Accordingly, Petitioner's claim is DENIED.

### 7.    Trial Court's Alleged Misconduct

Petitioner claims that his rights to confront witnesses and due process were violated by the trial court's requirement that a separately-tried co-defendant, Butch, assert his Fifth Amendment rights in front of the jury.  (Pet. at 6-D.)  This oddly-worded claim attains clarity after a review of the facts as stated by the state appellate court:

> Butch Lester was called as a prosecution witness, but he declined to testify, citing his Fifth Amendment rights and a pending petition for habeas corpus.  He was held in contempt to no effect after refusing to answer a series of questions.
> . . . .

23

> [Petitioner] has argued with regard to the admissibility of Butch's hearsay statements that Butch was not entitled to assert his Fifth Amendment privilege against self-incrimination in this case, and thus was not unavailable as a witness as required by the declaration against interest exception to the hearsay rule. He indicates that, if we disagree with his position on the privilege issue, then he wishes to join in the argument of other defendants that the court erred by forcing Butch to claim the privilege in front of the jury. The court found that Butch could not validly claim the privilege because his convictions of the Grondalski murders were final on appeal, and allowed the prosecutor to ask him some questions — e.g., "[D]id you see Chuck [Petitioner] stab Dallas Grondalski?" — before holding him in contempt for failing to answer and excusing him.
>
> We agree with [Petitioner] and the trial court that Butch could not avail himself of the privilege because his convictions were final. [Citations removed.] Accordingly, the court did not err in ordering him to testify. [Citation removed.]

(Ans., Ex. 1 at 41–42).

Petitioner has not shown that he is entitled to habeas relief on this claim. The trial court did not require Butch to assert his Fifth Amendment rights, as a review of the facts makes clear. Butch had been called by the prosecution to testify, not by the trial court. When so called, Butch had a choice to testify or not. When Butch refused to testify on grounds that he was not obligated to incriminate himself, the trial court held him in contempt as the right no longer obtained. Such facts indicate that Butch chose not to testify, and do not indicate that the trial court required Butch to assert his Fifth Amendment rights. As there is no factual basis for Petitioner's assertion, his claim is DENIED.

### 8 & 9.    Admission of Butch's Prior Convictions and Associated Prosecutorial Misconduct

Petitioner claims that the prosecutor's submission of evidence that Butch had been convicted of the Fort Bragg, and three unrelated, murders, and the trial court's admission of same, violated Petitioner's rights to a jury trial, confrontation and due process. (Pet. at 6-D.) He relatedly claims that the prosecutor's conduct violated his due process right to a fair trial. (Pet. at 6-E.)

The relevant facts are as follows. During trial the prosecutor informed the trial court that he intended to call Butch Lester as a witness, and argued that Butch could no longer permissibly exercise his right against self-incrimination as his appeal from the convictions

was final. (Ans., Ex. 6, Vol. 44 at 1451–52.)  The prosecutor stated that though he did not

know whether Butch would assert his Fifth Amendment rights, he wanted Butch to state such

an assertion before the jury. (Id. at 1454.)

Butch was allowed to testify.  With the jury present, the prosecutor asked Butch

whether he was "serving four life terms for murder." (Id. at 1458.)  Butch testified that he

would "be taking the Fifth on any issues." (Id.)  The trial court excused the jury so that the

parties could discuss Butch's testimony.  During this discussion, Butch asserted that he

would not testify at this trial because he had a pending federal habeas petition regarding his

convictions for the Fort Bragg murders, and because did not want to make any statements

that could be used against him if he were granted a new trial. (Id. at 1462, 1459.)  The trial

court assigned Butch counsel, and ordered Butch to appear at trial the next day. (Id. at

1504–05.)

The next day, Butch again took the witness stand.  The prosecutor asked Butch five

questions relating to the Fort Bragg murders.  Butch said nothing in response.  The trial court

held Butch in contempt. (Id. at 1516–17.)  Later, the trial court admitted documents

evidencing Butch's conviction of the Fort Bragg murders and the denial of his appeal. (Id.

at 1518.)

The state appellate court rejected the claims concerning this evidence, and the

prosecutions arguments based on it, finding that:

> This evidence was properly admitted.  Since Butch could not validly claim a
> Fifth Amendment privilege, the prosecution had the right to question him in
> the case, and the right to introduce evidence showing why the privilege did not
> apply. [Petitioner] notes that "[t]he opinions of other judges or juries as to the
> guilt or innocence of the accused are completely irrelevant to the present jury's
> performance of its constitutional duty," and ventures that "[b]y permitting the
> prosecutor to question [Butch] in front of the jury, the trial court introduced
> unsworn testimony that another jury believed Hass'[s] and Tankersley's prior
> testimony and concluded that [Petitioner] and [Butch] were guilty."  However,
> the evidence pertained only to Butch's guilt, not that of [Petitioner].  As the
> People correctly observe, no judge or jury expressed an opinion as to
> [Petitioner]'s guilt until the jury rendered its verdict in this case.
>
> [Petitioner] contends that the prosecutor committed misconduct in closing
> argument by maintaining that Butch's convictions and his assertion of a Fifth
> Amendment privilege were evidence of [Petitioner]'s guilt. The passages cited
> for this proposition read as follows:

"[I] ask you to consider that six years ago in this court, in this court, a Mendocino County jury rectified an injustice after eleven years and held Butch Lester accountable for these crimes.  And you now have an opportunity to bring justice to his partner in crime seated right down there, Mr. [Petitioner]. And you can finish the job.  And I'm going to ask you to do that."

"[Butch] had no right to refuse to testify.  He didn't testify because he's guilty. If he were innocent, he would get up there and say, '[I'm] innocent.  I didn't go up.'  Consciousness of guilt.  And moreover, who else was there to go up with him?  No one but [Petitioner].  No one but [Petitioner]."

These arguments cannot reasonably be construed as [Petitioner] claims.  The prosecutor did not submit that [Petitioner] was guilty because Butch was guilty, but rather that [Petitioner], and not some other person or persons as the defense claimed, was the one who acted with Butch in killing Dallas.  The prosecution's evidence, if believed, proved that [Petitioner] was the one who went with Butch to Fort Bragg and that he was Butch's "partner in crime." The argument was supported by the evidence and there was no misconduct.

(Ans., Ex. 1 at 42-43.)

Both of these claims raise the question whether Petitioner's jury was improperly influenced by the fact that another jury had convicted Butch of the Fort Bragg murders, the same murders on which Petitioner was facing charges.  On this record, this Court cannot say that the state appellate court's rejection  of these claims was improper.

Federal habeas relief is warranted only if there was constitutional error and that error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  Petitioner has met his burden on neither of these requirements.

In Namet v. U.S., 373 U.S. 179 (1962), the petitioner contended that the prosecutor committed misconduct by asking two witnesses incriminating questions regarding their relationship with petitioner "with the knowledge that the witnesses would invoke their privilege against self-incrimination."  Id. at 180.  The Supreme Court found no evidence of prosecutorial misconduct under these circumstances:

[C]ertainly the prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous.  In this case, the prosecutor initially did not believe that the [witnesses] could properly invoke their privilege against self-incrimination, reasoning with some justification that their plea of guilty to the gambling charge would erase any testimonial privileges as to that conduct.  His view of the law was supported by substantial authority, cf. Reina v. United States, 364 U.S. 507, 513, 81 S.Ct. 260, 264, 5 L.Ed.2d 249, and was in fact upheld by the trial judge.  Although it was later ruled that the guilty plea did not render all of the [witnesses'] conduct immune from further

1
2
3
4

> prosecution, thus making testimony as to that conduct privileged, there remained an independent and quite proper reason to call the [witnesses] as witnesses. Both [ ] possessed nonprivileged information that could be used to corroborate the Government's case. They could, and did, testify that they knew the petitioner, that he did frequently visit their variety store, and that they themselves had engaged in accepting wagers. The Government had a right to put this evidence before the jury.

5 (Id. at 188.)

6      Six years later, in Frazier v. Cupp, 394 U.S. 731 (1968), the Supreme Court

7 considered the question whether a trial court violated a petitioner's Confrontation Clause

8 rights when it allowed the prosecutor to call the petitioner's co-perpetrator Rawls to testify

9 regarding his confession to police. Before trial, defense counsel informed the prosecutor that

10 Rawls intended to invoke his right against self-incrimination if called to testify. (Id. at 733.)

11 In his opening statement, the prosecutor told the jury about the testimony he expected to hear

12 from Rawls, including the details of Rawls's confession. (Id.) Later in the trial, Rawls took

13 the stand and "informed the court that he intended to assert his privilege against self-

14 incrimination in regard to every question concerning his activities" on the day the crimes

15 were committed: "The matter was not further pursued, and Rawls was dismissed from the

16 stand. His appearance could not have lasted more than two or three minutes." (Id. at 734.)

17 Under these circumstances, the Supreme Court not only found no prosecutorial misconduct,

18 but it found no Confrontation Clause violation. (Id. at 737.)

19      Namet and Frazier, taken together, suggest that there was no constitutional error in

20 the trial court's rulings allowing Butch to be called to testify, and the admission of his

21 conviction was a logical corollary of that testimony. In his closing argument, the prosecutor

22 urged that Butch was guilty by conviction, and the question for the jury was the identity of

23 the other person(s) who committed the crime with Butch. The prosecution argued that it was

24 petitioner, based on the other evidence presented at trial, while petitioner argued that it was

25 more likely Tankersley and/or Haas. Under these circumstances, this was not constitutional

26 error either.[3] At the very least that the state appellate court's decisions on these claims not

27

28

---

[3] As respondent points out, no objection was made at trial to the prosecutor's closing arguments on this issue.

1    was contrary to clearly established federal law, or an unreasonable determination of the facts

2    under Supreme Court precedent.  Accordingly, Petitioner's claim is DENIED

3

4              **10.     Alleged Cumulative Error**

5              Petitioner claims that the cumulative effect of various trial errors resulted in prejudice.

6    (Pet. 6-E.)

7              Although no single trial error is sufficiently prejudicial to warrant the granting of

8    relief, the cumulative effect of several errors may still prejudice a defendant so much that his

9    conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893–95 (9th Cir.

10   2003).  However, where no single constitutional error exists, there can be no cumulative

11   error.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

12            Petitioner has not shown that there were any constitutional errors at trial.

13   Accordingly, the Court concludes that Petitioner has not shown that there was cumulative

14   error.  On this basis, Petitioner's claim is DENIED.

15

16   **C.     Motion to Appoint Counsel**

17            Petitioner has renewed his motion to appoint counsel.  (See Docket No. 13.)  In its

18   denial of Petitioner's first such motion, the Court concluded that the issues presented in the

19   petition were not of sufficient complexity that the appointment of counsel was warranted.

20   As regards the renewed motion to appoint counsel, the Court again concludes that the issues

21   presented do not warrant the appointment of counsel.  Accordingly, Petitioner's motion to

22   appoint counsel (Docket No. 13) is DENIED.

23

24                           **CONCLUSION**

25            The state court's adjudication of the claim did not result in a decision that was

26   contrary to, or involved an unreasonable application of, clearly established federal law, nor

27   did it result in a decision that was based on an unreasonable determination of the facts in light

28   of the evidence presented in the state court proceeding.  Accordingly, the petition is

DENIED.

A certificate of appealability will not issue.  Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the Court of Appeals.

This order terminates Docket No. 13.

The Clerk shall enter judgment in favor of Respondent, terminate all pending motions, and close the file.

**IT IS SO ORDERED.**

DATED: August 30, 2010

_____
SUSAN ILLSTON
United States District Judge